UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

PATRICE S.[1],                                    )
                                                  )
          Plaintiff,                              )
                                                  )
v.                                                )          CIVIL NO. 2:20cv230
                                                  )
ANDREW M. SAUL,                                   )
Commissioner of Social Security,                  )
                                                  )
          Defendant.                              )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) as provided for in the Social Security Act.  Section 205(g) of the Act

provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the

transcript of the record including the evidence upon which the findings and decision complained

of are based.  The court shall have the power to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the case for a rehearing."  It also provides, "[t]he findings of the

[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42

U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.     The claimant has not engaged in substantial gainful activity since August 20, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: diabetes; neuropathy; obesity; and a spinal disorder) 20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she can no more than occasionally operate foot controls with both feet and no more than frequently handle and finger with both hands.  She can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, crouch, and crawl.  She can never [work] around dangerous machinery with moving parts, and never operate a motor vehicle as part of her work-related duties.  She must use a medically necessary cane at all times while walking.

6.     The claimant has no past relevant work (20 CFR 404.1565).

7.     The claimant was born on May 24, 1973 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

(AR. 17-21).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits.

The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on January 21, 2021. On March 3, 2021 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on March 16, 2021. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

In August 2016 a physical examination of the Plaintiff revealed tenderness to palpation in the lumbar spine along with decreased adipose padding. (AR 938). An x-ray of the lumbar spine was then performed on August 31, 2016, revealing lumbar spondylosis. (AR 934). From that

4

point, imaging studies over the rest of the relevant period continued to reveal severe, degenerative changes to the lumbar spine. An x-ray in April 2017 found facet degenerative changes. (AR 305). An MRI the same month revealed disc protrusions contacting the nerve root at L2-L3 and L3-L4. (AR 303-304). These findings were re-demonstrated on a subsequent MRI on June 4, 2018. (AR 612). Plaintiff's examinations remained largely unchanged over the course of the record as well, with her consistently exhibiting severe symptoms including lumbar tenderness, paraspinal muscle spasms, and gait abnormalities.( AR 288, 612, 720, 750, 799, 820-821, 847, 890-891, 1015, 1048-1049, 1050-1051, 1411-1412, 1599-1600). Plaintiff was also noted to be using a cane on numerous occasions as well. (AR 1538, 1548, 1590, 1599-1600).

Plaintiff's cervical impairments also arose in 2016. In December 2016, Plaintiff underwent both an x-ray and an MRI of this region of her spine. The x-ray revealed degenerative disc disease at C5-C6, while the MRI uncovered a bulging disc impinging the thecal sac, spinal stenosis, and uncinate hypertrophy with bony encroachment of the neural foramina, all at C5-C6 as well. (AR at 288, 299, 301). Subsequent imaging studies in 2018 demonstrated bulging discs at C5-C6, and further revealed degenerative cervical spondylosis, joint hypertrophy, and "linear artifacts" at C6-7 and C7-T1. (AR 1476, 1482). Plaintiff's first cervical examination of record was held on December 12, 2016 and noted tenderness with a stiff, decreased range of motion, as well as hardened musculature spreading from the neck into the left shoulder. (AR 912-913). Subsequent examinations over the relevant period revealed many findings similar to Plaintiff's lumbar examinations, including pain, tenderness to palpation, painful range of motion, and paraspinal muscle spasms. (AR 284, 288, 720, 750, 847, 1022, 1048-1049, 1411-1412, 1538, 1548, 1590, 1599-1600). Many of these symptoms, especially her pain

5

and tenderness, were also found in much of the musculature around her neck and shoulder areas as well. (AR at 1022).

The testing for Plaintiff's cervical impairments led to the discovery of her shoulder impairments as well. The same initial examination for her cervical spine also revealed a painful range of motion in her left shoulder. (AR 912-913). In June 2017 Plaintiff complained of pain in the right shoulder with weakness and a pins and needles sensation, while an examination noted pain with cross-arm testing and a positive Hawkins sign. (AR 282, 297). Imaging of the right shoulder on June 23, 2017 found degenerative changes in the acromioclavicular (AC) joint. (AR 284, 307). Subsequent examinations routinely found tenderness, painful range of motion, crepitus, and muscle spasms in the right shoulder. (AR 890-891, 1538, 1541, 1548, 1599-1600). Additionally, records from 2017 and 2018 contain several notations of decreased muscle strength in the right arm as well. (AR 288, 1457).

Plaintiff was also diagnosed with neuropathy. (AR 890-891). The first objective notation of this condition was during an examination on March 17, 2017, when Plaintiff exhibited decreased monofilament testing from the soles of her feet up to her knees. (AR 890-891). Plaintiff subsequently underwent an electromyography (EMG) study on June 9, 2017, revealing abnormal motor and sensory conduction in all four extremities. (AR 295-296). Following these findings, Plaintiff underwent a second EMG approximately one year later, on July 10, 2018. This EMG specifically found that Plaintiff's motor and sensory latencies in her right hand were prolonged, that she had unobtainable sensory latencies for both the common and superficial peroneal nerves, and that she generally had prolonged conductions in the tested nerves of the lower extremities. (AR 1391, 1395). Examinations through the rest of the relevant period continued to note

6

neurological deficits.  (AR 359, 1048-1051, 1369-1371). In particular, an examination on March

12, 2018 found diminished epicritic sensation and a complete loss of protective sensation on the

monofilament test at all ten tested points. (AR 359). As noted above, several examinations also

revealed muscle weakness in the right upper extremity. (AR 288, 1457). Further, many of

Plaintiff's examinations demonstrated coordination abnormalities as well. (AR 1048-1051,

1369-1371).

At the hearing before the ALJ, Plaintiff testified to numerous symptoms and functional

limitations that she experiences as a result of her spinal impairments, shoulder impairments, and

neuropathy.  Plaintiff began her testimony by discussing her spine, indicating that she has pain in

both her neck and low back, with muscle spasms in the lumbar area and limited cervical range of

motion as well. (AR 43). She explained that her neck was in constant pain, and that the pain was

exacerbated by movement, causing it to shoot down her spine. (AR 44). She noted that she is

unable to turn her head to her shoulders as a result, and becomes dizzy when looking up or down.

(AR 43-44). She also testified that the neck pain causes near-daily headaches which at times

became so severe that she was forced to leave work. (AR 45-46).

Plaintiff testified that she experiences low back pain on a near-constant basis as well,

and that it frequently radiates to her hips and legs. (AR 47-48). Plaintiff explained that she has to

manually push her leg with her hands if walking up even a slight incline due to the severity of the

pain. (AR 47). Plaintiff indicated that this radiating pain causes significant weakness and balance

problems as well, such that her legs give out a few times per week and she loses her balance three

to four times per day. (AR 49-50). Plaintiff testified that, as a result of these symptoms, Dr. Vyas

– one of her treating physicians – prescribed her a cane approximately eight months prior to the

hearing, which she uses primarily for assistance balancing in addition to ambulation. (AR 49-52).

Additionally, Plaintiff explained that her lower extremity problems are further compounded with frequent leg numbness, occurring three to five times per day and lasting about one hour each time. (AR 52). Plaintiff stated that elevating her legs – as directed by Drs. Vyas and Lee – helped, but that the numbness returned as soon as she lowered them. (AR 52). Plaintiff indicated that, because of this, she keeps her legs elevated to approximately level with her hips in a recliner for about 75% of the day. (AR 53). Plaintiff also testified that the numbness was not restricted to her legs, but was in her hands as well. She indicated that she "always" had some degree of hand numbness, causing her to lose feeling and drop items multiple times per day. (AR 54).

Functionally, Plaintiff testified that she must take a break after walking about fifty steps due to pain in her legs and back. (AR 47). She indicated that, when grocery shopping, she must take a break for about ten minutes every fifty to seventy steps that she takes. (AR 48). She explained that the pain and weakness in her legs causes her to fall when she tries to bend or stoop, and that she can only stand without her cane for about one to two minutes. She also indicated that, because of the numbness in her hands, she has trouble writing and is only able to type or text for one to two minutes before needing a rest for about twenty minutes to get the feeling back in her hands. (AR 43, 56). She further explained that she is unable to open jars, and has trouble with buttons and zippers. (AR 55). Plaintiff also testified that she struggles to lift a gallon of milk due to her arm weakness, and is unable to cook – beyond using a microwave – or do dishes due to difficulty standing. (AR 58-59).

The ALJ proposed four hypothetical questions to the vocational expert (VE). (AR 61-63). The first hypothetical limited the claimant to light-level work with additional limitations

8

including occasional use of foot controls with both feet; frequent handling and fingering with both hands; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; never working at unprotected heights or around dangerous machinery; and never driving a motor vehicle as part of her work duties. (AR 61). The second hypothetical was identical to the first except for the addition of the need to use a medically-necessary cane while walking. (AR 62). Hypothetical three maintained these same limitations but added the need for the claimant to elevate her legs twelve to eighteen inches off the ground during the workday. (AR 62). The final hypothetical maintained all of these same limitations, but reduced the frequency of handling and fingering from "frequent" to "occasional." (AR 63).

The VE testified that an individual as described in the first hypothetical could perform the positions of Mail Sorter, Office Helper, and Counter Clerk. (AR 61-62). For the second hypothetical, the VE explained that the addition of a cane would render the claimant able to perform only sedentary-level work, but that there would be jobs at that level available, including that of a Table Worker, a Stuffer, and a Food and Beverage Order Clerk. (AR 62). The VE testified that these positions would still remain available under the third hypothetical. (AR 62). Following the fourth hypothetical, the VE indicated that the reduction to only occasional handling and fingering would eliminate all competitive employment. (AR 63).

In support of remand, Plaintiff first argues that the ALJ improperly omitted substantial objective evidence of record. In the Decision, the ALJ concluded that Plaintiff "does have evidence of an antalgic gait but with intact strength and sensation," citing to several exams with normal findings in those areas. (AR 22). However, Plaintiff contends that the ALJ ignored

substantial evidence of record that demonstrates significant abnormalities in both strength and sensation in her lower extremities.

Plaintiff notes that at numerous points throughout the Decision, the ALJ either omits or mischaracterizes substantial evidence of record. When discussing several of Plaintiff's impairments, the ALJ addresses only evidence favorable to his ultimate conclusions while ignoring evidence that tends to show Plaintiff's impairments are more severe and functionally limiting than the ALJ determines. At other points, the ALJ fails even to discuss the existence of other impairments and their supporting evidence. Plaintiff claims that the ALJ improperly cherry-picked evidence to support his conclusion at the expense of other evidence that is more favorable to Plaintiff, all while also failing to provide any meaningful discussion or analysis.

The Seventh Circuit has long held that, "[a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). While an ALJ is not required to discuss every piece of evidence in the record, an ALJ must not "cherry-pick" facts that support his conclusion while ignoring evidence to the contrary. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Ultimately, an ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Additionally, "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws…" *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004).

Plaintiff points out that the ALJ failed to mention Plaintiff's shoulder impairment. As

discussed above, the ALJ found that Plaintiff suffered from several severe impairments including "diabetes; neuropathy; obesity; and a spinal disorder," and also found that she was afflicted with the non-severe impairments of heart disease and depression. (AR 21-22). At no point during the severity determination, nor any other instance in the decision, did the ALJ mention Plaintiff's shoulder impairments.

Plaintiff's shoulder impairments are evidenced in the objective record. An x-ray of the right shoulder performed on June 23, 2017 revealed degenerative changes of the AC joint. (AR 307). Examinations in 2017 found tenderness in the right shoulder, pain with cross arm testing, and a positive Hawkins sign.( AR 297). A 2018 examination noted spasms and tenderness in the right shoulder, while examinations in early 2019 revealed tenderness, crepitus, and painful range of motion in addition to continuing spasms. (AR 1538, 1548, 1600). Plaintiff argues that the ALJ should have addressed these findings and explained why limitations to the use of the right shoulder were not included in the RFC.

In response, the Commissioner excuses the ALJ's omission of Plaintiff's right shoulder impairment by claiming that the ALJ cited to records showing symptoms in the shoulder, and that Plaintiff failed to show that the shoulder impairment was disabling. While the ALJ may have technically cited to some records that reference the shoulder, he at no point makes any note of either those specific findings or the shoulder impairment itself. (AR 19-20). The cited records that the Commissioner alleges demonstrate consideration of the impairment contain examinations of numerous parts of Plaintiff's body and multiple abnormal findings throughout. (AR 19-20, 1534, 1544, 1595-1596). Even a cursory review of the Decision makes it clear that these records are cited in support of the ALJ's conclusions regarding Plaintiff's neuropathy and spinal impairments,

11

and do not pertain to any analysis of the shoulder. (AR 19-20). Its clear that the ALJ never addressed Plaintiff's shoulder in the Decision. The ALJ does not reference any specific shoulder-related findings during the discussion of these records, nor does he note whether he found the impairment severe or non-severe. (AR 17-18, 19-20). Further, the ALJ ignores numerous other physical examinations and an x-ray that also all point to severe impairments in the shoulder. (AR 293, 303, 886-887, 1534, 1544, 1596). The ALJ should have, at a minimum, addressed the objective findings as related to the shoulder and determined whether that impairment is severe or nonsevere based on the records. Following that and if appropriate, the ALJ shoulder have included limitations for this impairment in the RFC.

The Commissioner also suggests that the RFC adequately accounts for the shoulder impairment, arguing that "there is no indication that the residual functional capacity assessment as written does not accommodate Plaintiff's sporadic right shoulder pain."  However, the Commissioner fails to point out which limitations prescribed in the RFC account for this impairment. The RFC contains no specific reference to the shoulder, nor does it contain any limitations to reaching in any directions, as one would expect when considering an impaired shoulder. (AR 18). There is absolutely no indication that the RFC contemplates any accommodations for Plaintiff's right shoulder impairment.

The Commissioner further argues that Plaintiff has "not shown that her functioning was limited by ongoing shoulder pain."  However, the extent of the limitation is a determination that should have been made by the ALJ based on his review of the testimony and objective medical record.  The impairment itself is medically determinable based on both imaging and numerous physical examinations that showed abnormalities in that joint – records which the ALJ failed to

12

address. (AR 293, 303, 886-887, 1534, 1544, 1596). Plaintiff repeatedly complained of pain and weakness in the shoulder. (AR 278, 282, 295, 1402, 1444-1445, 1537). Numerous physical examinations show notable issues in the shoulder, including muscle spasms, tenderness, and painful range of motion. (AR 293, 886-887, 1534, 1544, 1596). Imaging indicates the source of these complaints and exam abnormalities, revealing degenerative changes at the acromioclavicular joint. (AR 303). These complaints and findings are consistent throughout the record which all point to a substantial degree of limitation that, at the very least, warrant analysis on the part of the ALJ. (AR 1596).

Plaintiff further argues that the ALJ omitted significant evidence demonstrating the severity of Plaintiff's spinal impairments in favor of evidence showing only "mild abnormalities." (AR 23). When discussing Plaintiff's spinal impairments, the ALJ cited to only a portion of Plaintiff's imaging reports and found that said imaging revealed only "mild abnormalities to the lumbar and thoracic spine, as well as non-specific severity of spondylosis to the cervical spine." (AR 23). The ALJ again ignores substantial evidence, including additional imaging studies throughout the record, and also a host of clinical findings, all of which show that Plaintiff's spinal impairments are, arguably, well beyond the "mild" level.

The ALJ also completely ignores several imaging studies of both the cervical and lumbar regions as well. The ALJ declined to address a cervical MRI performed on December 15, 2016 that demonstrated hypertrophy with bony encroachment of the neural foramina at C5-6, as well as stenosis causing impingement of the thecal sac at that same level. (AR 288, 299). The ALJ also ignored a cervical CT from December 13, 2018 that noted apophyseal joint hypertrophy and bulging discs. (AR 1476). Similarly, the ALJ failed to discuss two separate lumbar MRIs from

13

April 3, 2017 and June 4, 2018. The April 2017 MRI notably revealed disc protrusions at L2-3 and L3-4. (AR 303-304). These findings were re-demonstrated by the June 2018 study, which also found a disc bulge contacting the exiting nerve root at L4-5 as well. (AR 612).

Additionally, despite claiming that he gave "careful attention" to Plaintiff's objective clinical findings, the ALJ does not discuss or cite to a single abnormal clinical finding in Plaintiff's spine, and instead merely mentions that Plaintiff's records generally display a "lack of greater objective focal or neurological deficit." (AR 23). However, contrary to the ALJ's findings, over the course of the relevant period, numerous cervical examinations found painful and reduced range of motion, pain in the paraspinal muscles, paraspinal spasms, a hunchback deformity, and general tenderness to palpation, which at some points was found to have spread into the upper extremity musculature as well. (AR 284, 288, 720, 750, 847, 896-897, 1015, 1022, 1048-1049, 1411-1412, 1535, 1548, 1590, 1599-1600). Similarly, undiscussed lumbar spine examinations revealed painful range of motion, muscle spasms, both intervertebral and paraspinal tenderness, and a positive facet challenge test. (AR 8, 617, 632, 720, 750, 799, 820-821, 847, 890-891, 938, 1015, 1048-1049, 1411-1412, 1599-1600). Further, at one point Plaintiff was found to be "diffusely tender to palpation" in both the cervical and lumbar regions. (AR 1015). Plaintiff argues that the ALJ's failure to address this evidence represents a clear case of improper evidentiary cherry-picking in violation of *Denton*. as the record contains plain evidence of the severity of Plaintiff's spinal impairments.

Plaintiff further argues that the ALJ ignored evidence of Plaintiff's neuropathy. The record shows that the ALJ failed to address the specific findings of Plaintiff's EMGs. Plaintiff underwent two separate EMG studies over the relevant period. The study from June 9, 2017 showed

abnormal motor and sensory conduction in all four extremities, while the July 10, 2018 study noted findings "consistent with sensory motor diabetic peripheral neuropathy," specifically including "unobtainable" sensory latency in the common and peroneal nerves, and prolonged motor and sensory latencies in the right hand. (AR 295-296, 1391, 1395). Plaintiff points out that these EMG results are particularly important because the ALJ specifically found that the record lacked "evidence as to upper extremity sensory changes (which fails to indicate the necessity of manipulative limitations)." (AR 24). Yet, both of these EMGs appear to contain evidence of abnormal sensory changes in the upper extremities.

The Commissioner, however, contends that the June 2017 EMG showed only "normal findings in all 18 tested muscles" while the July 2018 study "did not reveal any abnormal spontaneous single muscle fiber discharges in the tested muscles." The Commissioner's argument omits additional crucial evidence from the June 2017 test because it only addresses the final sentence on the last page of the exam report.(AR 321-322). The Commissioner fails to note that the full results of the test indicated abnormal motor conduction in five of the six nerves tested and abnormal sensory conduction in eight of the nine tested nerves. (AR 291-292). Notably, this included abnormalities in nerves of both the upper and lower extremities. (AR 291-292).

The Commissioner makes similar claims about the July 2018 EMG. Here, again, the Commissioner cites only to a portion of the actual test results, relying on the finding that the test "did not reveal any abnormal spontaneous single muscle fiber discharges." (AR 1392). The Commissioner omits the very next sentence in the report, which reads "[t]he findings are consistent with sensorimotor diabetic peripheral neuropathy." (AR 1392). Further, the Commissioner ignored the paragraph above the single-sentence citation which notably reveals

15

prolonged median nerve sensory latency in the right hand and sensory latency in the left hand indicated by prolonged Palmer Technique. (AR 1391). Like the June 2017 EMG, this test at least arguably demonstrates sensory deficits in the upper extremities. (AR 1391). Several other abnormalities were noted throughout this test as well. (AR 1391).

Plaintiff notes that the ALJ also ignored significant clinical findings of Plaintiff's neuropathy. The ALJ's only finding with regard to these symptoms was that "the objective clinical record contains sporadic reports as to sensory loss of the feet [sic]." (AR 24). However, the record contains several examinations that clearly showed neuropathic symptoms. On March 7, 2017 Plaintiff had an abnormal monofilament examination. (AR 890-891). About one year later, Plaintiff's March 12, 2018 exam revealed diminished epicritic sensation and a "complete loss of protective sensation" on her monofilament test. (AR 359, 1360). Finally, on June 28, 2018, an examination found decreased sensation to both lower extremities, as well as an absent Achilles reflex. (AR 1048- 1051). Yet, none of these examinations are even mentioned by the ALJ.

Additionally, the ALJ also ignored substantial evidence of Plaintiff's gait and strength abnormalities. Examinations in the record specifically indicate weakness in both the upper and lower extremities, generally rated 4/5 in most areas. (AR 288, 1048-1049, 1369-1371, 1457). Other examinations note several ambulation deficits, including repeated findings of slow gait, abnormal tandem and heel to toe walking coordination, and abnormal coordination overall. (AR 661, 750, 820-821, 847, 1048-1051, 1369-1371, 1538, 1599-1600). However, the ALJ concluded that the record only demonstrated "some diminishment to lower extremity strength (4/5)" and a "consistently documented" ability to ambulate. (AR 24). As the records indicate, Plaintiff's strength deficits are not limited to her lower extremities, but instead are found in her upper

extremities as well, to nearly the same degree as the lower extremities.

The ALJ also failed to address evidence of physical manifestations of Plaintiff's diabetes beyond the neuropathic symptoms, particularly in her lower extremities. Several examinations noted diminished hair growth with varicosities and telangiectasia, as well as pitting edema in the lower extremities. (AR at 359, 680, 1360). On March 14, 2019, Plaintiff was assessed with leg swelling. (AR 1538). In addition to these objective findings, Plaintiff also testified that both Drs. Lee and Vyas advised her to elevate her legs due to this swelling and accompanying pain, which she indicated that she does up to three-quarters of the day. (AR 53-54).

Clearly, in light of all the above, remand is necessary in order for the ALJ to fully address the entire record and then ensure that the RFC limitations are supported by the entirety of the evidence.

Next, Plaintiff argues that the ALJ's RFC lacks evidentiary support because, as discussed above, the ALJ failed to address significant portions of the objective record. A claimant's RFC "represents the maximum a person can do – despite his limitations – on a 'regular and continuing basis.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing a claimant's RFC, "an ALJ must evaluate all limitations that arise from a medically determinable impairment and may not ignore a line of evidence contrary to the rule." *Eakin v. Astrue*, 432 Fed.Appx. 607, 615 (7th Cir. 2011). This includes limitations for impairments found both severe and non-severe. 20 C.F.R. 404.1545(a)(2). Further, "[t]he RFC determination should include a discussion describing how the evidence…supports the ultimate conclusion." *Id*. While an ALJ "need not discuss every piece of evidence," he must still provide "some minimum level" of analysis of the evidence. *Eakin*, 432 Fed. Appx. at 615.

17

In *Eakin*, the court ultimately concluded that the "paucity of analysis" offered by the ALJ, combined with a failure to address "several lines of evidence contrary to the ruling" created sufficient grounds for remand. *Id*; *see also Villano v. Astrue*, 556 F.3d 558, 568 (7th Cir. 2009) (finding that an ALJ's "cursory analysis" of the medical evidence and claimant's testimony failed to support his RFC). The *Eakin* court found that the ALJ provided a recitation of the medical records and then "concluded the RFC determination with a terse statement that the record 'does not provide a basis for finding limitations greater than those determined in this decision.'" *Id*. The Court found that this conclusion was "too perfunctory to permit meaningful appellate review." *Id*.

Plaintiff argues that, here, as in *Eakin*, the combination of the ALJ's hasty analysis, cherry-picking of evidence, and conclusory statement regarding Plaintiff's limitations undermines the RFC and warrants reversal. As discussed above, the ALJ entirely omitted from analysis medical evidence demonstrating Plaintiff's shoulder and lower extremity impairments. (AR 21, 23-24, 53-54, 297, 307, 359, 680, 1360, 1538, 1548, 1600). He very briefly touched on Plaintiff's neuropathy and coordination abnormalities overall, but again omitted significant testing and examinations showing the extent of the impairment, finding that the records lacked evidence of the impairment in the upper extremities contrary to both examinations and multiple EMG studies. (AR 288, 295-296, 359, 661, 750, 820-821, 847, 890-891, 1048-1051, 1360, 1391, 1395, 1457, 1538, 1599-1600). Similarly, the ALJ noted only "mild abnormalities" in her spine while failing to mention the MRI studies showing severe degenerative changes, as well as the plethora of examinations demonstrating severe symptoms and limitations. (AR 8, 23, 284, 288, 303-304, 612, 617, 632, 720, 750, 820-821, 847, 890-891, 896-897, 938, 1015, 1022, 1048-1049, 1411-1412,

18

1599-1600).

This Court finds that the ALJ's conclusions are not supported by the evidence of record which necessitates a remand of the ALJ's decision. *Eakin*, 432 Fed. Appx. at 615; *Villano*, 556 F.3d at 568.

Next, Plaintiff argues that the ALJ improperly credited his own opinion rather than that of a medical professional. When discussing the limitations caused by Plaintiff's impairments and the respective supporting evidence, the ALJ noted that Plaintiff underwent only "exceptionally conservative modalities of treatment," finding that her "lack of more aggressive treatment…fails to indicate necessity of greater limitations." (AR 23-24). While Plaintiff's treatment did largely consist of medication, physical therapy, and injections, the record indicates that this was under the specific advice and direction of one of her treating physicians, Dr. Nuthakki. In fact, on June 4, 2018, Dr. Nuthakki specifically opined that Plaintiff was not a surgical candidate. (AR 1028). Dr. Nuthakki issued this opinion after also noting that Plaintiff's other treatment modalities – including therapy, injections, and medication – had all failed. *Id*. However, Dr. Nuthakki's opinions were not addressed in any capacity by the ALJ.

The Seventh Circuit has established that it is error for an ALJ to rely on a perception of a lack of aggressive treatment absent evidence of accepted, appropriate treatment. *Myles v. Astrue*, 582 F.3d 672, 677-678 (7th Cir. 2009)(finding that ALJ's cannot make their own inferences about treatment levels without record support); *see also Martinez v. Astrue*, 2011 WL 4834252. *8 (N.D. Ind. 2011)(holding that ALJs should cite to evidence of appropriate treatment if finding a claimant's treatment level to be too conservative).

Plaintiff argues that in the present case, the ALJ committed reversible error by improperly

making inferences about Plaintiff's treatment history without evidentiary support and contrary to evidence of record, and used those inferences as a crucial aspect in assessing the RFC, thereby inappropriately "playing doctor" and failing to adequately support his RFC determination and build a "logical bridge from the evidence to his conclusion. *Clifford* 227 F.3d at 872; *Eakin* 432 Fed.Appx. at 612; *Myles* 582 F.3d at 677-678; *Schmidt* 914 F.2d at 118; *Voight* 781 F.3d at 875.

In response, the Commissioner contends that the ALJ's reliance on Plaintiff's treatment modalities is proper because he was merely "accurately, and appropriately, [stating] what was in the record." Nevertheless, the ALJ must provide evidentiary support for his findings, and should cite to evidence of other appropriate treatment options when finding that a claimant's treatment is too conservative. *Myles v. Astrue*, 582 F.3d 672, 677-678 (7th Cir. 2009); *Martinez v. Astrue*, 2011 WL 4834252. *8 (N.D. Ind. 2011). Here, the ALJ cites to no such evidence. He repeatedly finds that Plaintiff's treatment level does not indicate further restrictions than those assessed, yet declines to suggest what treatment she should have undergone. (AR 19-20). Further, the ALJ fails to address Dr. Nuthakki's opinions that Plaintiff has both failed conservative treatment options, and is also not a surgical candidate. (AR 1024).

This Court holds that the ALJ's finding that Plaintiff's treatment modalities are insufficient lacks evidentiary support and is contradicted by the opinion of the treating physician. Accordingly, remand is required.

20

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: March 25, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court

21